Cornelia O'Connor GREY, James Charles
Grey and Michael Carter Grey,
Appellants,

v.

**FIRST NATIONAL BANK IN DALLAS**
et al., Appellees.

No. 22988.

United States Court of Appeals
Fifth Circuit.

March 21, 1968.

Rehearing Denied June 14, 1968.

Charles L. Stephens, John C. Andrews, Fort Worth, Tex., Neil A. Pollio, Leon Alexandroff, New York City, J. A. Gooch, Fort Worth, Tex., for appellants.

E. Taylor Armstrong, Storey, Armstrong & Steger, Dallas, Tex., for appellee, First Nat. Bank in Dallas, Successor Trustee of Ivor Elizabeth O'Connor Morgan Trust.

H. W. Strasburger, Royal H. Brin, Jr., Dallas, Tex., for appellee, First Nat. Bank in Dallas, Successor Trustee of James Charles O'Connor Trust, Stras-

burger, Price, Kelton, Martin & Unis, Dallas, Tex., of counsel.

J. Edwin Fleming, John N. Jackson, Ernest E. Figari, Jr., Henry C. Coke, Jr., Dallas, Tex., for appellee, First Nat. Bank in Dallas, Coke & Coke, Dallas, Tex., of counsel.

Marvin F. Sentell, Z. T. Fortescue, III, Asst. Attys. Gen., Crawford C. Martin, Atty. Gen. of State of Texas, Austin, Tex.

Before BROWN, Chief Judge, and GEWIN and WRIGHT,* Circuit Judges.

J. Skelly WRIGHT, Circuit Judge:

Appellants, Cornelia O'Connor Grey, and her two sons, James Charles and Michael Carter Grey, beneficiaries of the James Charles O'Connor Trust, brought suit against appellee First National Bank in Dallas, Trustee of the O'Connor Trust, in the United States District Court for the Northern District of Texas, alleging First National's complete disregard of its fiduciary duties in fraudulently acquiring trust property for its own use. Appellants sought rescission of a 1960 Partition and Sale Agreement through which the property was acquired. In the alternative, appellants demanded damages, actual and exemplary, based on alleged fraud. The case was submitted to the jury on a special verdict form. On the basis of its findings, judgment was entered dismissing plaintiffs' complaint on the merits. We affirm.

Of crucial importance in this extremely complicated lawsuit are the events preceding the signing of the Partition and Sale Agreement in September 1960 and the circumstances surrounding the Texas state court judgment of November 28, 1960, which approved that transaction, thereby relieving the bank of the restrictions against self-dealing imposed by the Texas Trust Act. Since this appeal presents, *inter alia*, a claim that the District Court erred in not directing a verdict in plaintiffs' favor and in overruling plaintiffs' motion for judgment notwithstanding the verdict, we shall review the evidence in some detail.

I.

In 1910 James Charles O'Connor created a testamentary trust for the benefit of his wife, three daughters and grandchildren. His will provided that after the death of his wife the income would be divided equally among his daughters, and as each daughter died, the remainder in that daughter's share would go to that daughter's lawful issue in equal shares *per stirpes* or, in default of such issue, to such person or persons as were designated in that daughter's will. Shortly after his wife's death, one of the daughters died without issue. Her will provided that her third of the trust go in fee simple in equal undivided amounts to her two surviving sisters. The second daughter also died without issue; a settlement arising from a contest of her will provided that almost half of her original interest in the trust go in fee simple to her sole surviving sister, Mrs. Cornelia O'Connor Grey, with the remainder of her interest being placed in a charitable trust—the Morgan Trust. Thus, of the property originally placed in the O'Connor Trust, 20/60ths remains in that trust, 19/60ths is owned by Mrs. Grey in fee simple, and the Morgan Trust owns 21/60ths in fee simple. Mrs. Grey is the sole income beneficiary of the O'Connor Trust and her sons, James and Michael, are her lawful issue and therefore the remaindermen to whom the trust properties will be delivered upon the termination of that trust at Mrs. Grey's death.

The principal assets owned jointly by the O'Connor Trust, the Morgan Trust and Mrs. Grey individually are eight downtown Dallas lots. First National has been the successor trustee of the O'Connor Trust since its merger in 1954 with the prior trustee, Dallas National Bank. In addition, since 1954 First National has been the successor trustee of the Morgan Trust and agent for Mrs.

---

* Of the District of Columbia Circuit, sitting by designation.

Grey under a written agency agreement for the management of her 19/60ths interest in the jointly owned Dallas property.

The trust real estate involved in this litigation is located in City Block 60. This map of Block 60 shows the property therein:

Prior to the merger of First National and Dallas National Bank, Mrs. Grey, the O'Connor Trust and the Morgan Trust owned Tract 8 (Republic Garage Building) which is west of the center of the block, extending from Pacific Street on the north through to Elm Street on the south, with a frontage on both streets of over 50 feet. First National considered acquiring this property for a proposed motor bank and in 1950 approached Dallas National Bank, Trustee, not directly but through Z. L. Majors, agent for undisclosed principal. The attempted acquisition was unsuccessful, but First National obtained a long term lease on the property immediately adjoining Republic Garage to the east, and began constructing the motor bank and underground passage to connect the motor bank with its main office directly south across Elm Street. Early in 1954, still prior to its merger with Dallas National Bank, First National again considered acquiring a long term lease of the Republic Garage Building, again using Majors, but this time disclosing the previously undisclosed principal. However, further steps were abandoned since the proposed merger was soon to be effected.

Shortly after the merger, Z. L. Majors, Trustee (now ostensibly acting for the Murchison interests), purchased the lot adjoining Republic Garage on the west (the A'Mell Building). The purchase price of that building was $650,000, the whole amount having been borrowed by Z. L. Majors, Trustee, from First National. When the Murchisons declined to proceed with the transfer and several other potential takers balked, the A'Mell property was offered to Mrs. Grey, the O'Connor Trust and the Morgan Trust in an even trade for their Republic Garage property. First National's trust officer approved the trade and recommended that Mrs. Grey proceed, without telling her that the money used to purchase the property came wholly from First National, that First National's general

counsel represented both the O'Connor Trust and Z. L. Majors, Trustee, and that the appraisal submitted to Mrs. Grey (the so-called Dunham appraisal) was $100,000 in excess of Majors' purchase price.

One month after the exchange of properties, Majors offered to sell Republic Garage to First National for cancellation of the $650,000 debt. First National refused. Subsequently a National Bank Examiner criticized the unsecured loan, as did First National's internal examining committee, for although all interest had been paid when due, there had been no repayment of any part of the principal. Finally First National was given a deed of trust for Republic Garage for the amount of Majors' indebtedness.

Meanwhile, Mrs. Grey became dissatisfied with the A'Mell property; contrary to her expectations and representations made by First National's trust officer, the rental income from the building decreased rather than increased. This, together with other grievances she had stemming from First National's handling of her trust properties, prompted Mrs. Grey in March 1958 to give notice to First National of her intention to revoke her agency agreement with respect to those properties in which she held an interest individually and to substitute for First National its leading competitor, Republic National Bank of Dallas.

As early as January 1956, First National had tried to persuade Mrs. Grey to partition the various properties held in undivided interests by the O'Connor Trust, the Morgan Trust and Mrs. Grey individually. It had explained to her that it believed that the Morgan Trust was being disadvantaged by her unwavering decision to retain the real estate in her father's estate [1] and that such a partition would enable First National to perform more effectively its fiduciary duties to all parties concerned. When, in 1958, Mrs. Grey indicated her inten-

---

1. The agency agreement entered into between Mrs. Grey and First National specifically limited First National's power so that it was without authority to sell or exchange Mrs. Grey's interest without first obtaining her consent.

tion to revoke First National's agency agreement, First National again asserted its desire to partition. Mrs. Grey then temporarily withdrew her threatened revocation, but First National continued to press for partition.

In preparation for such a partition, First National requested the Dallas Real Estate Board to appraise all of the relevant properties. This appraisal was completed by October 1959, but Mrs. Grey was having difficulties deciding how she wanted the properties partitioned. First National made no suggestions or proposals, but continually repeated its desire to have the partition completed as soon as possible. In March 1960 Mrs. Grey made her "final decision" to partition the A'Mell property to the Morgan Trust, since its value, according to the 1959 appraisal, was now only $500,-000 and she had neither the time nor the money with which to develop the property.

During the time that the parties were preparing for the partition, First National was considering the advisability of constructing a new bank building. A site study committee was appointed to make an investigation. At an executive committee meeting on March 3, 1960, the results of that investigation were reviewed, but the four plans presented were all rejected. Instead, the consensus was to acquire, if possible, all of City Block 60, in which was situated First National's motor bank and the A'Mell property. Three real estate firms were then engaged to acquire the eastern half of the block and their combined efforts bore fruit shortly thereafter.

Having been advised of the realtors' success, First National's president, Mr. Stewart, notified the bank's trust officer that the pending partition was to be postponed until agreement was reached with respect to the A'Mell property. A meeting was arranged with Mrs. Grey and her attorney, Mr. Leo Dorsey, to take place in New York on April 25, 1960. At that meeting Mr. Stewart informed Mrs. Grey of the bank's interest in the A'Mell property and told her that, because of a potential conflict of interests, First National would resign as trustee of the O'Connor and Morgan Trusts. Mrs. Grey insisted that resignation was not necessary and she adhered to this position even after she was informed that if the bank remained trustee a court proceeding would be required to free First National from the restrictions against self-dealing in the Texas Trust Act. Mrs. Grey stated that the only condition she would impose was that she get a better price than Majors would be getting for Republic Garage. It was also agreed at this time, pursuant to Mr. Dorsey's suggestion, that, prior to the sale, the A'Mell property would be partitioned to Morgan Trust since that Trust was entitled to favorable tax treatment.

On May 10, 1960, the Board of Directors of First National officially approved acquiring all of City Block 60. It was at this time that Majors deeded the Republic Garage to the bank in liquidation of his $650,000 indebtedness. First National offered Mrs. Grey $750,000 for A'Mell [2] and she tentatively accepted. Dorsey then advised her against it and negotiations continued, culminating in a series of meetings in Dallas in early September 1960. Present were Mr. Stewart, First National's chairman of the Building Committee and its general counsel, Mrs. Grey, her son James, and Mr. Dorsey. Mr. Stewart offered to call someone in from the trust department, which suggestion was rejected, and he again offered to have First National resign as trustee of the two trusts, which was also rejected. Dorsey spent the morning of the first day criticizing the bank's past handling of trust affairs and the after-

2. Since the A'Mell property was to be partitioned to Morgan Trust prior to the sale, neither Mrs. Grey individually nor the O'Connor Trust was technically a seller. Nevertheless, First National sought to obtain Mrs. Grey's approval of the purchase price because that price would in turn be the value assigned to A'Mell for purposes of the partition agreement.

noon was spent discussing property values in City Block 60. The second morning, Dorsey was given, at his request, a schedule of prices paid for other properties in the block and there was some discussion of whether at the time of purchase and sale of Republic Garage Majors was First National's nominee or First National had any interest in that property. All such inquiries were answered by First National's representatives in the negative. That afternoon, Mrs. Grey called the bank, stating that an acceptable price at which to value A'Mell was $1,155,000. That figure was arrived at by multiplying the interior area by the per square foot figure to be paid Majors and computing the corner area in the same manner at an additional 25 per cent for corner property. The next day, Mr. Stewart obtained approval of the Board of Directors' Executive Committee to accept the $1,155,000 price, and that evening he and Mrs. Grey shook hands on the deal.

First National's general counsel drafted a Partition and Sale Agreement which provided for the partition of several tracts of property [3] and for the purchase of one of those tracts (A'Mell) by First National for $1,155,000. The Agreement stated that both the partition and the sale were subject to a judgment being entered by a court of competent jurisdiction in a proceeding in which all of the persons bound by the Agreement, the Attorney General of Texas,[4] and the remaindermen, James and Michael Grey, were parties. In contemplation of such a suit, First National agreed to retain for the O'Connor Trust counsel recommended by Mrs. Grey, and Mrs. Grey agreed to file an answer praying that the Agreement be approved and to recommend to the remaindermen that they file a similar answer. Finally, all persons agreed to cooperate in consummating the Agreement in the most expeditious manner possible; indeed, the Agreement specifically stated that in the event the judgment was not final by December 31, 1960, all rights and duties under the Agreement would terminate.

The Partition and Sale Agreement was presented to Mrs. Grey and James for their signatures, but they left Dallas that evening for New York without signing. Aboard the plane, Dorsey explained the various provisions of the Agreement first to Mrs. Grey and then again to James. The following Monday, September 19, Mr. Stewart flew to New York where Mrs. Grey and James signed the Agreement. Mrs. Grey then flew to Paris, France, where, on October 8, Michael signed his name. Neither James nor Michael was named as a contracting party to the Agreement, but each executed it, stating his approval, ratification and adoption with the same force and effect as if he were a party thereto.

Mrs. Grey neither selected nor retained counsel to represent her or her sons in the Texas court proceedings. She seemed intent on having the deal go through and did not want independent counsel to complicate a relatively simple agreement. First National then suggested that Mr. Philip Kelton represent the O'Connor Trust since his firm had previously done some work for it. Kelton in turn contacted Dorsey, asking if he were also authorized to represent Mrs. Grey and her sons, and Dorsey assured him that he was so authorized. On November 19, 1960, First National initiated suit in a state district court in Dallas County, Texas, with the bank in its individual

---

3. A'Mell, valued at $1,155,000, was partitioned in its entirety to Morgan Trust. The value of the remaining seven tracts was, according to the 1959 Dallas Real Estate Board appraisal, $1,675,000, and these seven properties were partitioned to Mrs. Grey individually and the O'Connor Trust in undivided interests of 19/39ths and 20/39ths respectively. Since the value assigned A'Mell exceeded Morgan Trust's 21/60ths interest in all eight properties by $164,500, Morgan Trust was to pay to Mrs. Grey individually $80,141.-03 and to the O'Connor Trust $84,358.97.

4. Under Texas law, the Attorney General was necessary as a representative of the public beneficiaries of the Morgan charitable Trust. Article 4412a, Revised Civil Statutes of Texas.

capacity as plaintiff and the bank as trustee of the O'Connor Trust, the bank as trustee of the Morgan Trust, appellants here and the Attorney General of Texas as parties defendant. First National asked the court to find that the partition and sale provided for in the Partition and Sale Agreement were fair and equitable, to rule that it was relieved from restrictions under the Texas Trust Act with respect to self-dealing, and to approve and confirm the Partition and Sale Agreement, Kelton filed a joint answer on behalf of First National as trustee and appellants here, admitting the truth of the allegations in the petition and praying that the judgment sought be granted.[5] A hearing was scheduled for November 26.

The hearing lasted the greater part of the day and was characterized by the presiding judge as "a more than fair disclosure." Judgment was entered on November 28 and became final 30 days thereafter, just a few days before the December 31 deadline. Despite the fact that Mrs. Grey then refused to sign the Partition Deed (and has not signed the Deed to this day), the sale from the Morgan Trust to First National in its individual capacity was consummated. First National subsequently obtained the outstanding properties in City Block 60 and broke ground for its 52-story bank and office building.

In February 1961 Mr. Dorsey presented Mrs. Grey with a bill in the amount of $100,000 for attorney fees in connection with Mrs. Grey's transactions in Dallas. In the spring of that year, she was served in New York with a summons to appear in a lawsuit there against her individually for those fees, now valued at $140,000 plus $256.59 disbursements. Mrs. Grey then sought other New York counsel, present counsel of record, to defend her against Dorsey. An answer was subsequently filed in the New York courts denying liability, and a counterclaim was filed against Dorsey for damages resulting from unskillful and grossly negligent representation of Mrs. Grey. At the same time, counsel wrote First National that he believed the Partition and Sale Agreement was unenforceable and that "in disposing or otherwise dealing with the real property in question * * * you will be acting at your sole risk and peril." Nonetheless, First National proceeded with its plans and by the time this suit was brought in May 1963 its building, occupying the entire City Block 60, was completed.

## II

We turn now to a consideration of appellants' specification of errors. They argue first that the District Court erred in denying their motions for a directed verdict or for judgment *n. o. v.* because the undisputed evidence conclusively showed, as a matter of law, that First National failed to make the requisite full disclosure to appellants of all facts within its knowledge material to its self-dealing.[6] We do not agree. Only where the evidence is such that there can be but one reasonable conclusion as to the verdict to be returned may the court

---

5. Morgan Trust, represented by independent counsel (Mr. Armstrong) who had been selected by First National, filed a similar answer.

6. Appellants allege that the evidence established that First National (1) concealed its deed of trust covering Majors' $650,000 loan; (2) misrepresented its relationship with Majors; (3) concealed the proposed Sanger-Harris project which was to occupy the entire City Block 232 immediately north of City Block 60 (knowledge of this project was allegedly acquired by First National through its officers and directors who were also offi-

cers and directors of the Baptist Foundation of Texas, an organization that was instrumental in assembling City Block 232).; and (4) concealed, if not falsified, its over-all costs of acquiring City Block 60 since, although Mrs. Grey was given a schedule of prices paid to the owners of the other fees in the block, no information with respect to the costs of terminating existing leaseholds or brokers' commissions was ever furnished her. (First National did furnish these figures to its own Board of Directors, thereby allegedly showing that reasonable businessmen would consider such information material.)

grant a motion for a directed verdict. Brady v. Southern Railway Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239 (1943). On the other hand where, as here, there are facts in the record as to which there is a genuine dispute and from which reasonable minds might draw different inferences,[7] it is incumbent upon the court, as it did in the instant case, to submit the question to the jury. See, e. g., Pan American Petroleum Corp. v. Orr, 5 Cir., 319 F.2d 612, 617 (1963). Moreover, appellants had the burden of proving a breach by First National of its fiduciary duties, and when the party moving for a directed verdict has such a burden, the evidence to support the granting of the motion must be so one-sided as to be of overwhelming effect. 2B W. Barron & A. Holtzoff, Federal Practice and Procedure § 1075 at 396 (Wright ed. 1961); 5 J. Moore, Federal Practice ¶ 50.02[1] (2d ed. 1967). Considering the evidence before us as we have recited it in our statement of the facts, we find that the District Court properly submitted the case to the jury.

 The jury's resolution of the disputed facts is quite clear. The jury was asked:

"SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that the First National Bank in furnishing information to Mrs. Grey, James Grey, and Michael Grey leading to the partition and sale agreement of September 19, 1960 and the judgment of the State Court of November 28, 1960 made any material misrepresentations?

"Answer 'yes' or 'no' as to each party."

The jury answered "no" as to every party. The jury was also asked:

"SPECIAL ISSUE NO. 3

"Do you find from a preponderance of the evidence that the First National Bank in the negotiations with Mrs. Grey, James Grey, and Michael Grey leading to the partition and sale agreement of September 19, 1960 and the judgment of the State Court of November 28, 1960, concealed any material facts?

"Answer 'yes' or 'no' as to each party."

Again the jury answered "no" as to every party. These questions were all-inclusive: all of appellants' allegations were fully developed at trial and all were resolved against them. The court in charging the jury made it clear that the fraud issue related not only to the execution of the Partition and Sale Agreement, but to the entry of the state court judgment as well. The questions as phrased had the same effect.[8] The jury might have

7. Thus there is a dispute as to what First National said with reference to Majors; when information of the Sanger-Harris project can first be attributed to First National; and what information Dorsey had or received with respect to leaseholds and brokers' commissions.

8. Since the jury found that the state court judgment was not procured by fraud, this court need not reach an issue which would otherwise assume paramount importance. Thus, in supplemental briefs, the parties have devoted considerable time and effort to explaining the difference between "extrinsic" and "intrinsic" fraud insofar as it relates to setting aside a prior judgment. Such discussion was probably considered necessary since the parties admitted that under Texas law (which we must apply since in these proceedings we are exercising diversity jurisdiction, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) a prior judgment can be set aside for lack of jurisdiction or for fraud, O'Boyle v. Bevil, 5 Cir., 259 F.2d 506, 512 (1958), cert. denied, 359 U.S. 913, 79 S.Ct. 590, 3 L.Ed. 2d 576 (1959), but the fraud which is a valid ground for such purposes must be "extrinsic" to the prior judgment. Alexander v. Hagedorn, 148 Tex. 565, 226 S. W.2d 996, 1001 (1950). The jury's determination that there was no fraud makes the inquiry as to whether the allegations constituted extrinsic or intrinsic fraud of academic interest only.

This case is another vivid illustration of the great utility of the Rule 49(a), Fed. R. Civ. P., general charge and special verdict which this court so often heralds. See, e. g., Weymouth v. Colorado Inter-

found that there was no misrepresentation or no concealment or that those found were not material.[9] The scope of our review is such that we neither sift facts nor draw inferences from such facts. This function is performed by the jury and so long as the evidence has that minimal quality required to send the case to the jury, the jury's resolution of the factual issues will prevail. Williams v. National Surety Corp., 5 Cir., 257 F.2d 771, 772–773 (1958).

Assuming that the evidence was sufficient to take the case to the jury, appellants maintain that the verdict still may not stand because the charge to the jury was both incomplete and misleading. They argue first that the District Court, in effect, refused to advise the jury of their contention that simple failure on the part of the First National, as trustee, to disclose material facts was an issue. Appellants refer specifically to the court's comment:

"The issues in this case for your decision are: (1) Whether the First National Bank in its individual capacity misrepresented or concealed material facts which were relied on to the damage of Plaintiffs * * *."

By using "misrepresented" and "concealed," appellants assert, the court placed an undue burden upon them, since such words not only connote affirmative acts, unlike negative silence in failure to disclose, but in addition may even connote bad faith. We find no merit in this argument. We have repeatedly held that a charge "must be viewed as a whole, in connection with the contentions aired by the parties in the Court below, and it must be viewed from the standpoint of the jury." *See, e. g.*, Garrett v. Campbell, 5 Cir., 360 F.2d 382, 386 (1966). Considered as a whole, we find that the court did charge the jury that an issue was First National's failure to disclose. For example, the court stated that "[i]t is the contention of Plaintiffs that the Bank as Agent and Trustee violated its fiduciary duties * * *" and that "[t]he First National Bank denies that it misrepresented or concealed any material facts, contending on the other hand, that *it made a full disclosure* of all material facts." (Emphasis added.) The court also charged the jury that "there must be fair dealing and good faith by the Trustee toward the beneficiary" and the "Trustee * * * has a duty to impart to the beneficiary all material facts in dealings between the Trustee and the beneficiary." [10]

Moreover, in examining the record we find that appellants themselves were not

---

state Gas Company, 5 Cir., 367 F.2d 84, 93, n. 31 (1966).; American Oil Company v. Hart, 5 Cir., 356 F.2d 657, 659 and n. 5 (1966). The general charge illumines the verdict questions-answers and vice versa. Every critical fact has been excised against nearly every likely contingency to enable us to analyze the legal contentions against specific, identifiable findings, not just a series of assumed implied findings from an unrevealing general verdict and its enigmatic mysteries. *See, e. g.*, Notes 10, 12 and 13 *infra* and related text. By this method our inquiries were simplified to determine as to each challenge (a) the formal correctness of the verdict answer and supporting charge, (b) the substantive correctness of the charge and verdict question, and (c) the sufficiency of the evidence to support the answer.

9. Thus, for example, with respect to Majors, his connection with First National and the deed of trust would be material,

and First National's failure to disclose or its concealment would be a breach of its fiduciary duties, only if First National would not have paid Majors the same price had he not been so indebted. There was evidence, however, that there was never any talk of foreclosure or of First National's power to foreclose, that the Republic Garage property simply was not worth more than $650,000, and that B. H. Majors, Z. L. Majors' brother, partner and an accommodating party on the note held by the bank, was worth, at a conservative estimate, over a million dollars.

10. The complete charge to the jury on this point is as follows:
"* * * [T]he relationship of principal and agent is fiduciary in nature and therefore the agent is required to be loyal and to act in good faith. The Agent * * * *has the duty of imparting to his principal,* every material fact relating to a transaction, if in the scope of the agency,

always conscious of a difference between misrepresentation and concealment, on the one hand, and failure to disclose, on the other. Thus in Paragraph 19 of their complaint they stated, "Bank was under *a duty to disclose* to plaintiffs each and all of the facts alleged in paragraph 18 hereof, and *by concealing the same* * * *" (emphasis added). The same phraseology is utilized in Paragraphs 22 and 56, and if appellants may use the terms interchangeably, they should not be heard to complain if the court does also.

■ Appellants also object to the court's definition of "material," alleging that it completely disregarded the nature of the confidential relationship between appellants and First National. The court's charge defining "material" [11] was a complete and accurate dictionary definition of the term. Moreover, in order to appraise its sufficiency, it must be read in conjunction with other parts of the charge bearing on the relationship of the parties. When so read, we find the charge on "material" adequate.

■ Finally, appellants claim that the court's instruction that Mrs. Grey was bound by the state court judgment and that James and Michael were likewise bound unless the jury found that they had not authorized Kelton to represent them was tantamount to instructing a verdict for First National on the issues of fraud and damage. Again we find no merit in this objection. The court's charge, taken as a whole, shows that the issue of the state court's jurisdiction was completely separate from the issue of whether First National fraudulently obtained that judgment. The distinction is also clear from the special interrogatories: Special Issue No. 1 went to Kelton's authority; Special Issues Nos. 2 and 3 to the alleged concealment or misrepresentation. We therefore see no basis for appellants' contention that the jury might have believed that if it answered "yes" as to Kelton's authority, it was bound to answer "no" as to fraud.

■ Since we find that the evidence was sufficient to take the case to the jury, that there were no errors requiring reversal in the court's charge, and that the jury's verdict is amply supported by the record, we hold that appellants' motions for a directed verdict,[12] for

---

on becoming aware of such facts during the course of the transaction.

· "The First National Bank, in addition to being the agent of Mrs. Grey, was the Trustee of the O'Connor Trust, of which Mrs. Grey was the beneficiary, and James C. and Michael C. Grey were the Remaindermen-beneficiaries.

*　　*　　*　　*

"You are instructed that the Trustee of a Trust occupies the position of a fiduciary of the Trust, that is, there must be fair dealing and good faith by the Trustee toward the beneficiary. The Trustee has the duty to act in the best interests of the beneficiary of the Trust, and *has a duty to impart to the beneficiary* all material facts in dealings between the Trustee and the beneficiary." (Emphasis added.)

11. "As to the term 'material', as used in this charge, I instruct that for a fact to be 'material' to a transaction, it should be of solid or weighty character; substantial; of consequence; not to be dispensed with; important."

12. Appellees correctly note that, even if the court had directed a verdict for ap-

pellants, it would then have had to submit to the jury the question of the amount of damages sustained by appellants. In fact, such a question was given to the jury:
"SPECIAL ISSUE NO. 5
"Do you find from a preponderance of the evidence that Mrs. Grey, James C. Grey, or Michael C. Grey were damaged by such misrepresentations, if any, or concealments, if any?
"Answer 'yes' or 'no' as to each party."
The jury answered "no" as to every party. Perhaps of even greater significance is the jury's negative answer to the following:
"SPECIAL ISSUE NO. 11
"Do you find from a preponderance of the evidence that the A'Mell Building had a fair market value in excess of $1,155,000.00 on September 19, 1960?
"Answer 'yes' or 'no'"
Therefore, even if the court had erred in not directing a verdict for appellants, appellants would not have been prejudiced thereby.
Appellants also sought exemplary damages, but, according to Texas law, such

judgment *n. o. v.*, and for a new trial were properly denied.

## III

■ Appellants also contend in their specification of errors that the District Court should have directed a verdict in favor of James and Michael Grey since the evidence showed that they were denied due process of law with respect to the 1960 state court judgment. Appellants' complaint stated that James and Michael "were never personally or constructively served with process in the aforesaid action, nor did they appear therein either personally or by a duly appointed attorney," and that consequently the state court judgment is void as to them. Appellants acknowledge that the judgment itself stated that "[a]ll persons having any interest in the subject matter of this suit are properly before the Court," but they correctly note that the fact that the judgment recites

jurisdiction does not necessarily prevent the court from inquiring into facts disclosed by the complete record. O'Boyle v. Bevil, 5 Cir., 259 F.2d 506, 513 (1958), *cert. denied*, 359 U.S. 913, 79 S.Ct. 590, 3 L.Ed.2d 576 (1959); Lutcher v. Allen, 43 Tex.Civ.App. 102, 95 S.W. 572 (1906).[13]

■ Appellants admit that Dorsey told Kelton that Kelton was authorized to represent James and Michael, and that Kelton, in good faith reliance upon that representation, filed an answer on their behalf in the state court proceeding.[14] There is also no dispute that Dorsey was authorized to speak for Mrs. Grey, but appellants assert that he was her attorney *only* and not an attorney for her sons as well.[15] Appellants claim, therefore, that Dorsey was without authority from James and Michael to engage Texas counsel to represent them. Dorsey did represent the boys in at least one other matter, but in that instance,

---

recovery presumes a showing of malice, Baker v. Moody, 5 Cir., 219 F.2d 368, 371 (1955); Mossop v. Zapp, Tex.Civ.App., 189 S.W. 979, 981 (1916), which the jury was unable to find, as is illustrated by its negative answer to the following:

"SPECIAL ISSUE NO. 7

"Do you find from a preponderance of the evidence that the First National Bank acted with malice in its actions relating to the partition and sale agreement of September 19, 1960 or in obtaining the Judgment of the State Court of November 28, 1960?

"Answer 'yes' or 'no'."

13. Normally the relevant record would be that of the prior court's proceeding, but since counsel for First National made no objection to the introduction in the District Court of any of appellants' evidence which might be probative of the state court's lack of jurisdiction over James and Michael, we have given such evidence the same force it would be entitled to if it were part of the original record. *See*, *e. g.*, Texas Pacific Coal & Oil Co. v. Ames, Tex.Civ.App., 284 S.W. 315, 317 (1926), *reversed on other grounds*, Tex. Com.App., 292 S.W. 191 (1927).

14. It is undisputed that Kelton filed a *joint* answer on behalf of the O'Connor Trust and Mrs. Grey, James and Michael. Appellants claim that the joint answer,

which admitted the truth of the allegations of First National's petition and asked the court "to approve the proposed transaction by entering the Judgment prayed for in Plaintiff's Petition," constituted a confession of judgment. Appellants further argue that Rule 314 of the Texas Rules of Civil Procedure provides that when judgment is confessed by an attorney, the judgment is not valid unless the judgment itself recites the power of attorney to confess such a judgment. We find this objection to be without force, since the state court proceeding cannot realistically be characterized as a confessed judgment: the hearing lasted almost a full day; six witnesses testified; 13 exhibits were introduced; the transcript covers 85 pages; the judge complimented the attorneys for "a thoroughly developed case"; and, quite significantly, the state Attorney General's approval of the proposed transaction was not given until after the *end* of the proceedings.

15. Appellants note that when Dorsey sought compensation for his efforts in connection with the Dallas transaction he submitted his bill to Mrs. Grey alone. The suit which was subsequently initiated to collect his fees was also brought against her alone. In addition, Dorsey's office ledger sheet carrying the account contained only her name and not also the names of James and Michael.

**384**

unlike the present, Michael had supplied a specific, written authorization. Again with reference to Michael, Dorsey testified that he had not communicated with him after April 1960. Kelton had never communicated with either James or Michael, nor had representatives of First National personally contacted or attempted to contact Michael or James, with respect to the state court proceeding.[16]

 Appellants assert that, given this evidence, it was error for the District Court to deny their motion for a directed verdict as to James and/or Michael Grey. We do not agree. As noted above, the party moving for a directed verdict has a heavy load, particularly when he also carries the burden of proof on the issue in question. 2B W. Barron & A. Holtzoff, Federal Practice and Procedure § 1075 at 396 (Wright ed. 1961); 5 J. Moore, Federal Practice ¶ 50.02[1]

(2d ed. 1967).[17] Here, as with the issue of fraud, we find that the evidence is not such that it showed without dispute that James and Michael did not authorize the employment of Kelton to represent them. Accordingly, we find that the District Court properly denied appellants' motion and submitted the issue to the jury.

The issue was phrased as follows:

"SPECIAL ISSUE NO. 1

"Do you find by a preponderance of the evidence that Philip Kelton did not have authority to represent James C. Grey or Michael C. Grey in the case of First National Bank against Cornelia O'Connor Grey et al, in the 116th Judicial District Court, Dallas County, Texas?

"Answer as to each party, 'He was not authorized', or 'He was authorized'."

16. Appellants stress the lack of communication between First National and James and Michael, alleging that James and Michael were denied state due process insofar as they were not given the notice required by § 24, subd. E of the Texas Trust Act, Article 7425b, Texas Revised Civil Statutes:

"A court of competent jurisdiction may * * * for cause shown and *upon notice to the beneficiaries*, relieve a trustee from any or all of the duties, limitations and restrictions which would otherwise be placed upon him by this act." (Emphasis added.)

We need not reach appellees' claim that James and Michael are not beneficiaries within the meaning of this section and therefore not necessary parties to the suit. Instead, since we affirm the finding of the District Court that Kelton was authorized to represent James and Michael, we merely note that under Rule 121 of the Texas Rules of Civil Procedure, an answer constitutes an appearance of the defendant so as to dispense with the necessity for the issuance of service of citation upon him. Moreover, since the notice requirement of the Texas Trust Act is to give notice, we can find no harm to James or Michael, who had each signed the Partition and Sale Agreement which, according to its terms, was conditioned upon the entering of a judgment in such a proceeding to be commenced as soon as possible.

17. An attorney who enters an appearance for a party is presumed to be authorized to do so. Hidalgo County Drainage Dist. No. 1 v. Magnolia Petroleum Co., Tex.Civ. App., 47 S.W.2d 875, 876 (1932); Dyer v. Johnson, Tex.Civ.App., 19 S.W.2d 421 (1929). Appellants attempt to counteract this argument by pointing out that no presumptions, particularly as to jurisdiction, prevail with respect to judgments, such as the 1960 state court judgment, rendered pursuant to special statutory requirements. Mingus v. Wadley, 115 Tex. 551, 285 S.W. 1084, 1089 (1926); Cunningham v. Robison, 104 Tex. 227, 136 S.W. 441 (1911). First National argues that the purpose of the provisions of § 24, subd. E of the Texas Trust Act by which it submitted the Partition and Sale Agreement to judicial scrutiny is to enable a trustee to put to rest once and for all any questions of unfairness or improper self-dealing on its part. We do not agree, since we find no evidence of legislative intent that this action have any more conclusive effect of finality than would any other Texas judgment. But neither do we believe that a recitation of the law that no presumptions with respect to jurisdiction attach to statutory actions counteracts or even is relevant to the proposition that an attorney who appears in court for a party is presumed to be authorized to represent that party.

385

The jury answered as to both James and Michael "He was authorized," and we find that there is sufficient evidence in the record to support this conclusion.[18] James was personally present and actively participated in the September negotiations in Dallas; at that time Dorsey purported to speak for "Mrs. Grey and her sons" and James did not deny his authority to do so. Michael testified that he left the management of his interest to his mother and never disagreed with her about such matters. Mrs. Grey told Dorsey (in front of James) to direct all correspondence about the Partition and Sale Agreement to her and "she would take it up with the boys." Indeed, the letter Dorsey wrote Mrs. Grey in November 1960 saying that he had authorized Kelton to represent her and her sons reached her in Paris where she was staying with both of her sons. Thus the jury could reasonably have found that the Dallas transaction was a family affair, that the mother spoke for the family, and that Dorsey was the family attorney protecting the family interests.

Nonetheless, appellants would have this court disregard the jury's finding. They claim that it is undisputed that Dorsey authorized Kelton and that therefore the question should have been phrased to ask whether James and Michael authorized Dorsey. As the issue was phrased, they claim, the jury might have thought that so long as Kelton was authorized by anyone, they must answer yes. We see no basis for this contention, since the jury's answer was explicit: "James C. Grey: He was authorized. Michael C. Grey: He was authorized." Moreover, Rule 49 of the Federal Rules of Civil Procedure "clearly leaves the matter of the form of a special verdict and interrogatories to the sound discretion of the trial court." De Eugenio v. Allis-Chalmers Mfg. Co., 3 Cir., 210 F.2d 409, 415 (1954).

Appellants also take exception to the instructions accompanying Special Issue No. 1, whereby the jury was told that authority can be conferred directly or by an agent, that it can be written or oral, and that it can be "express," "implied" or "apparent." Appellants object that there is no evidence to support the instruction as to apparent authority. Considering the evidence as we have already summarized it, we disagree and find that the District Court did not abuse its discretion either in phrasing the question to be answered or in instructing the jury on the applicable standards.

IV

Appellants also allege errors relating specifically to the conduct of the trial in the District Court, or, in the alternative, an abuse of the trial court's discretion in the handling of that trial. We find these allegations to be without merit.

Appellants first object to the trial court's refusal to admit certain documentary evidence which was probative of First National's knowledge, prior to the November 28, 1960 judgment,[19] of contemplated substantial improvements in the block immediately north of City Block 60.[20] These documents consisted primarily of pre-September 14, 1960 letters and memoranda produced by the Baptist Foundation of Texas (BFT) at depositions of its executive secretary. First National had objected to the introduction of such documents because there was no evidence that the persons writing or receiving them[21] were at that time

18. In effect, therefore, we find no merit in appellants' alternative specification of error, that is, that the District Court abused its discretion in denying appellants' motion for a new trial on the ground that the jury's answer to Special Issue No. 1 was contrary to the overwhelming weight of the evidence.

19. Appellants assert and appellees agree that First National's duty of disclosure

did not cease with the signing of the Partition and Sale Agreement, but rather continued through the time judgment was entered by the state court on November 28, 1960.

20. This refers, of course, to the Sanger-Harris project discussed *supra* in Note 6.

21. The two principal persons involved were a Mr. Carr Collins, a director of First National and a member of its executive

acting on behalf of BFT. There is evidence that an agency relationship existed after September 14,[22] and appellants would have this court find that that is a sufficient basis from which to imply a similar relationship prior to that time, so as to provide a proper predicate for the introduction of the documents. We do not agree. The fact of agency must be proved and cannot be presumed. 3 Am. Jur.2d Agency § 349 at 706 (1962). Since it is clear that the party who seeks to introduce written evidence must in some way authenticate it, 7 J. Wigmore, Evidence § 2130 (3d ed. 1940), and since appellants made no attempt to show that the writers of the documents who could have authenticated them were unavailable as witnesses and could not have been summoned to testify, we find no error or abuse of discretion by the trial court in refusing to admit the documents in question.

■■■ Appellants' second objection is directed at the trial court's refusal to answer directly a question sent out by the jury during the course of its deliberations. The question was as follows:

"Was their [*sic*] any testimony to indicate whether the bank told Mrs. Grey or her attorney that Mr. Majors owed the First National bank $650,000.00 on The Republic Garage building."

Appellants requested the court to instruct the jury that there was no testimony in the record indicating First National told Mrs. Grey or her attorney about the Majors note or deed of trust. Instead, the court responded: "The Jury is the exclusive judge of the evidence." We believe the court's reply was an appropriate one. In order to answer the question on the merits, the judge would have had to review over 2,000 pages of transcript and 400 exhibits and, in the absence of direct testimony, draw an inference as to the proper answer. This would have been an insurmountable burden. As an alternative, the judge could simply have tried to recall the evidence and evaluate its significance, but in so doing she would have been acting as a 13th juror. Appellants argue that at least the trial judge should have instructed the jury that it had a right to request any portion of the testimony to be read to it in open court by a court reporter. We need not now consider this objection since appellants did not request such an instruction below. 2B W. Barron & A. Holtzoff, Federal Practice and Procedure § 1021 at 310–312 (Wright ed. 1961); 5 J. Moore, Federal Practice ¶ 46.02 (2d ed. 1967).

■■ Appellants' third objection goes to the trial court's limiting of their time for an opening statement and closing arguments to the jury. Appellants assert that the complexity of the case, the length of the trial (three weeks), and the variety of their allegations necessitated their being given more than 30 minutes for their opening statement and one hour and 20 minutes for their closing argument. This limitation, they allege, greatly inhibited their ability properly to present and summarize to the jury their claims and the evidence to support them. However, this is a question so clearly committed to the discretion of the trial judge that we would intervene only where there is an egregious abuse of that discretion. *See, e. g.,* Rosiello v. Sellman, 5 Cir., 354 F.2d 219, 220 (1965). This case simply does not satisfy that criterion and accordingly we reject appellants' allegation.

Lastly, appellants note that the District Court in granting a directed verdict for the Morgan Trust and the state Attorney General at the close of the plaintiffs' case stated:

"I am not sure that I am making myself clear, but I think that there

---

committee, and a Mr. Richards, an executive in an insurance company owned and controlled by Mr. Collins.

22. First National did not object to the introduction of documents attributable to Collins and Richards after September 14, 1960, and such documents were admitted and considered by the jury.

are two reasons why there are no grounds for setting aside the partition —one is that I do not think that it would be equitable to do it, and the second is that it has been approved by the State Court, and that the O'Connor Trust and Mrs. Grey were represented, and the lawyers who represented them were authorized to act * * *."

Appellants correctly note that the trial judge filed no findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P., to support this conclusion. But curiously appellants do not request that this case be remanded for such findings and conclusions on the so-called equitable issues in this case. Instead, they ask that this court find that as a matter of law they are entitled to judgment. On the record evidence we are unable to make this finding.

## V

Finally appellants object here to the District Court's allocation of counsel fees,[23] alleging, in brief, that the O'Connor Trust was surcharged with fees for an attorney[24] who defended First National contrary to the best interests of the trust beneficiaries, appellants here. Appellants specifically charge that counsel for First National in its individual capacity, counsel for First National as trustee for the Morgan Trust, and counsel for the O'Connor Trust worked in conjunction with each other and filed similar, if not identical, answers, and that ironically counsel for the O'Connor

Trust can only justify his presence by noting that he cross-examined the beneficiaries of the trust, James and Michael at trial and Mrs. Grey at deposition.

■■■ We begin with the general proposition that a trustee may charge his trust for attorney's fees which the trustee, acting reasonably and in good faith, incurs in defense of litigation charging him with a breach of trust. 2 A. Scott, Trusts § 188.4 (1956). We have stated that the jury found no breach of the bank's fiduciary duties and thus we may assume that First National as trustee of the O'Connor Trust was acting reasonably and in good faith. Appellants, however, object that First National "did not come into a court of equity and say with candor: 'I have defended myself successfully against claims of my beneficiaries and am entitled to an allowance for my attorneys, Messrs. Coke & Coke, my general counsel,' and that instead Bank's stratagem was to seek an allowance for the fees of a *second* set of attorneys on the pretense that the services rendered were in defense of 'the trust' * * *." (Emphasis in appellants' brief.) We need only note that the suit was orginally brought by the appellants and that they specifically named the trusts as well as First National in its individual capacity as parties defendant. Appellants should not now be heard to object that the parties they joined have defended themselves.

There is, however, one complication. It appears that the O'Connor Trust, like

---

23. A hearing was held on May 20, 1965, on a motion for the payment by the O'Connor Trust and the Morgan Trust of the fees and expenses of the attorneys respectively retained by First National to represent such trusts.

24. Mr. Strasburger, a member of Philip Kelton's firm, was selected by First National to represent the O'Connor Trust. He testified:

"* * * [S]omebody that was disinterested had to be in here to see that that Trust was treated right and to see whether or not the Bank had

taken advantage of them, and that was the attitude in which I took employment and I made it known when I first took employment that I wasn't going to be a rubber stamp in here for the First National Bank and that I was going to reserve my decision until everything had been developed, and if I thought the Trusts hadn't been treated right, I'd be joining the Plaintiffs, and if I thought that the Trusts had a fair settlement, I would be in here fighting for it and trying to save it * * *."

the Morgan Trust, was originally joined only because it would be a necessary party were the court to grant the equitable relief requested. Indeed, the court asked counsel for the O'Connor Trust:

"THE COURT:

Let me ask you this: If the Plaintiffs had brought simply a damage suit for fraud, do you think that it would have been necessary for the Trusts to have been brought in?

"MR. STRASBURGER:

I certainly don't. I think that's what they should have done in the first place—very strongly."

Consequently, appellants assert that, when the Morgan Trust sought and was granted a directed verdict at the close of the plaintiffs' case, counsel for the O'Connor Trust should have done likewise. This would have minimized the amount of chargeable time and in turn the amount of fees recoverable from the trust.[25]

 Although appellants here raise a valid point, we find no prejudice. It is clear that First National could have charged the O'Connor Trust for all fees and expenses of attorneys representing it in its individual capacity since it was exonerated of a charge of breach of trust initiated by the trust beneficiaries, and it is equally clear that the bank voluntarily paid or will pay all such fees and expenses. Moreover, the allocation of counsel fees is a question of discretion vested in the District Court and we find no abuse of that discretion which would warrant either reversal or remand. American National Bank of Beaumont v. Biggs, Tex.Civ.App., 274 S.W.2d 209 (1954).

Accordingly, the judgment of the District Court is

Affirmed.

25. Appellants note that the Morgan Trust was charged $45,000 whereas the O'Connor Trust was charged $50,000, because the latter "took a greater responsibility in the trial of the case, and was here for a longer time in court."