UNITED STATES of America for the Use and Benefit of CONTRACTORS EQUIPMENT COMPANY and Contractors Equipment Company, Plaintiffs,

Travelers Insurance Company, Subrogee to Plaintiff, Hertz Equipment Rental Corporation, Plaintiff-Appellant,

v.

TRINITY UNIVERSAL INSURANCE COMPANY et al., Defendants-Appellees.

No. 71–1301.

United States Court of Appeals, Fifth Circuit.

March 31, 1972.

Thomas S. Terrell, Paul Nimmons, Jr., Houston, Tex., for plaintiff-appellant.

Tom Alexander, Fred Collins, Houston, Tex., for defendants-appellees.

St. John Garwood, Jr., Houston, Tex., for Hertz Equipment Rental Corp.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal poses two principal questions which, after nearly ten years of litigation, are far removed from the issue originally presented when the predecessors of Hertz filed a Miller bond suit against Carlton and his Falcon Construction Company, Inc. for rental payments alleged to be due for the lease of a heavy crane. Through a history revealing changes in parties, satisfaction of certain claims under the Miller Act Bond, and settlements between other parties, the appeal still presents these issues: (1) Is Trinity Universal Insurance Company liable to Hertz, as successor to Contractors Equipment Company, which admittedly leased the Manitowoc Crawler Crane for use on the government contract, for damage to the boom of the crane when it collapsed while lifting one of the gates of the lock about which it was engaged. The answer to this question depends upon whether the insuring agreement covered this loss for the benefit of the insured, Carlton, and the additional insured, Contractors Equipment Company.[1] The second question is whether the trial court properly disposed of the contention of the plaintiff, Hertz, that, regardless of whether Trinity Universal was liable on its policy, defendants Carlton, Carlton d/b/a Falcon Construction Company or a third party, Falcon Construction Company, Inc.,

---

1. It is noted that Contractors Equipment Company was, by endorsement, included in a loss payable clause, and the pretrial stipulation states that Contractors Equipment was an "additional insured".

which company admitted actually operating the crane at the time of the failure, were, one or all, liable for damages to the boom by reason of their negligence in its operation.

We carve out of the mass of suits, counter-claims, cross complaints, Miller Act claims, and ordinary suits for damage to bailed property the essential facts in order properly to decide the issues we have here to consider.

On September 24, 1962, a Manitowoc Crane, owned by the original plaintiff, Contractors Equipment Company and rented by defendant, Carlton d/b/a Falcon Construction Company and/or Falcon Construction Company, Inc. was mounted upon a barge near the mouth of the Colorado river in Texas. Carlton and his companies had a contract with the U. S. Government to raise and renovate certain sections of the canal locks. While in the process of raising one of these gate sectors, the boom of the crane collapsed causing the damage to the crane that is here sued for.

## THE COVERAGE

At the time of this occurrence, Falcon had in effect what may be known as an inland marine all-risk contractors equipment policy obtained from Trinity. This policy was originally issued on January 12, 1961 and renewed on the 12th day of January, 1962. This policy, by its terms, covered four scheduled items of heavy construction equipment. Three of these items were cranes, two of which had booms much like the Manitowoc crane, later acquired. The fourth of the original items was a "drag line" which had a 60 foot boom.

Attached to the original policy, and bearing the same date, is an endorsement which states:

"It is understood and agreed that this policy is extended to cover loss or damage to the insured property caused by boom collapse.

It is further understood and agreed that Exclusion 3 is deleted from this policy."

The foregoing language appears in typewritten form and it is on an endorsement form at the bottom of which appears the following printed language: "All other terms and conditions of this policy remain unchanged."

It later became necessary for Falcon to acquire a different crane for the work covered by this particular contract, and the Manitowoc Crane was leased in August, 1962. At that time there was issued an endorsement as follows:

"It is understood and agreed that the following item is added to the schedule of equipment under this policy:

Added:                    Amt. of Ins.

12.  One (1) 4000 Manitowoc
     Crawler Crane, S#4016 ..... $120,000.00

The limit of the Company's Liability in any one disaster is amended to read:  $225,000.00"

The foregoing was typewritten on the endorsement form which also contains at the bottom thereof, the language: "All other terms and conditions of this policy remain unchanged."

At some later time Contractors Equipment Co. obtained what may be called a "floating all-risk" policy from Travelers Insurance Company about whose coverage of this loss there has been no question.[2]

To make the general picture complete it must be noted that each of the two insurers undertook to avoid payment if other valid insurance existed on the equipment. The Travelers policy contained the following language:

"In case other valid and collectible insurance exists on any property hereby insured at the time and place of loss, the insurance under this policy shall be considered as excess insurance

2. In fact, in the present posture of the case, we find Travelers suing as subrogee of Contractors Equipment Company (now Hertz), which has already been paid its loss on a loan receipt executed to Travelers.

and shall not apply or contribute to the payment of any loss until the amount of such other insurance shall have been exhausted . . . "

The Trinity policy read as follows:

"This *policy does not insure against*:

Loss, if, at the time of loss or damage, *there is any other valid and collectible insurance which would attach if this insurance had not been effected,* except that this insurance shall apply only as excess . . . " (emphasis added)

Liability under its policy was denied by Trinity on two grounds—first that the jury's finding that an internal defect caused this collapse brought into play one or more exclusions enumerated in the policy; second, that the Trinity "other insurance" clause kept it from being operative. The trial court carefully analyzed the Trinity policy and concluded that a proper construction of the policy and riders excused the insuror from liability. Having concluded that the insuring agreement did not cover this loss it was, of course, not necessary for the court to resolve the "other insurance" issue.

Moreover, the court, as explained below, did not permit the jury to pass on the question of tort liability by some of the defendants.

Although we agree that Trinity is not liable on its policy, we reach this result for different reasons than did the trial court. Nevertheless, we think it necessary to pose this coverage issue as it was dealt with by the trial court. We shall deal hereafter with the "other insurance" issue.

### THE RISK, EXCLUSIONS AND CONDITIONS

Referring back to the policy itself, the first paragraph provides:

"This policy covers on the property described below [at the time this represented the four items of equipment mentioned above, and later the added Manitowoc crane] or in schedule attached, to not exceeding the amount specified in respect of each of the machines described, against loss or damage thereto, *directly caused* by the risks and perils insured against." (emphasis added)

Following a list of the property we then find on page two the following pertinent language:

"THIS POLICY INSURES AGAINST DIRECT LOSS OR DAMAGE RESULTING FROM Any *external* cause except as hereinafter excluded. (emphasis added)

THIS POLICY DOES NOT INSURE AGAINST:

1. Loss or damage occasioned by the weight of a load exceeding the registered lifting or supporting capacity of any machine;

\* \* \* \* \* \*

3. Loss or damage except by fire while the insured property is being waterborne unless otherwise endorsed hereon;

\* \* \* \* \* \*

7. Wear, tear, and gradual deterioration; breakage and/or rust, unless the same be the direct result of fire, lightning, explosion, cyclone, tornado, windstorm, flood, earthquake, collision, derailment or overturn of conveyance, malicious damage or aircraft damage;

### SPECIAL CONDITIONS

It is a condition of this insurance, that all articles insured hereunder are in sound condition at the time of attachment of this insurance. . . . "

Thus, to recapitulate, we have an inland marine policy protecting the insured against direct loss or damage resulting from any external cause except as modified by any inconsistencies with the printed policy or by any exclusions that were not eliminated by the "boom collapse" endorsement, and also subject to any special conditions which were not eliminated by the "boom" endorsement.

We thus come right down to the simple question whether the inclusion as

part of the original policy[3] of the so called "boom" endorsement eliminates the requirement that to recover it must be shown that the damage to the boom (1) resulted from an external cause; (2) was not occasioned "by the weight of a load exceeding the registered lifting or supporting capacity of [the crane]; (3) that the loss or damage was not loss by reason of "wear, tear and gradual deterioration; breakage and/or rust"; and (4) that the article insured was "in sound condition at the time of attachment of this insurance."

The appellant, Travelers, contends that the attachment of the "boom collapse" rider meant that the owner was protected in case of damage to, or caused to other insured property, by the collapse of a boom, no matter how brought about. In other words, it contends that such collapse need not result from "external cause", and it would still be covered though not designed for the lift of 90 tons, was not in sound condition at time the policy attached, or was caused by any of the excluded causes enumerated in exclusion Number 7 quoted above.

Trinity replies that although the boom indorsement extended coverage to both external and internal causes; *all* exclusions and conditions contained in the original policy are still in effect, and that the only effect of the "boom collapse" rider was to cover such a collapse whether or not it was the result of an external cause.

## ACTION BY THE TRIAL COURT

The trial court adopted the construction advanced by Trinity and posed the following special interrogatory to the jury:

"Did the boom on the crane at the time it was delivered to the job site have some undetected, structural defect that would render it incapable of lifting the gate, in accordance with the plans submitted by Carlton to the Corps of Engineers as shown on plaintiff's Exhibit No. 16, which, absent such a structural defect, it could have lifted, and, if so, did such a defect play any part, no matter how small, in actually bringing about or causing the collapse of the boom?"

The trial court also instructed the jury that if they answered this question in the affirmative they need not answer subsequent questions, inquiring into possible negligence of the operating personnel as being the cause of the collapse.

We find the task of construing the insuring clause, the exclusions and conditions in light of the language in the rider, to be an extremely difficult one. We conclude, however, that there is not the slightest value to be gained by our trying to unravel this knot. This is so because of the language contained in the Trinity policy which prevents its attaching under conditions such as existed here when Travelers issued its floater policy.

## THE "OTHER INSURANCE" CLAUSES

■ To say, as we do here that it is not necessary to decide whether Trinity's policy provides coverage is, in effect, to conclude that the "other insurance" provisions in the respective policies issued by Travelers and Trinity are not in conflict. In the alternative, it is to conclude that Travelers provides primary coverage while Trinity provides only excess coverage. Trinity argues that there is no need to reach the issue of specific versus general insurance coverage. Their argument is stated as follows:

"It is perfectly clear that the insurance afforded by the plaintiff's policy would attach to the loss in the instant case if the insurance issued by defendant had not been effected. The result is that the insurance of defendant does not cover this specific loss at all except as excess insurance. It is not valid and collectible insurance

---

3. It will be remembered that the "boom collapse" endorsement was attached to the original policy and bore the same date.

within the terms of the "other insurance" provision of the plaintiff's policy. On the other hand, the plaintiff's policy is other valid and collectible insurance which would attach if the defendant's insurance had not been effected."

It does appear that a literal reading of the Trinity policy produces the result contended for by the appellee Trinity Insurance Company. Travelers, on the other hand, contends that both provisions were intended to limit coverage to excess insurance and, no matter how sophisticated language might be used by Trinity, it did no more than make it completely inconsistent with the similar provision in the Travelers policy.

Trinity relies heavily on the Fifth Circuit case, St. Paul Fire and Marine Insurance v. Garza County Warehouse and Marketing Association, (5th Cir. 1937) 93 F.2d 590, a case arising in the Northern District of Texas for the proposition that the language used by Trinity is to be construed literally to provide coverage only if no other insurance would attach.

In the St. Paul case the insurer had issued a policy covering cotton held in plaintiff's warehouse. A fire occurred destroying the cotton. There were two sets of cotton which were involved— one batch of 35 bales and another of 119 bales. The 35 bales belonged to the named insured and the 119 bales had been pledged to a third party. The 35 bales were insured by the Insurance Company of North America whose policy said that it "should be void to the extent of any other insurance company directly or in-

directly covering the same property, whether prior to or subsequent in date." The 119 bales were insured by the pledgee by Hartford Insurance Company, whose "other insurance" clause is not quoted in the opinion.[4]

The St. Paul policy contained a clause as follows:

"It is understood and agreed that this insurance does not cover any cotton on which the owner *has other insurance* which would attach if this insurance had not been issued . . ." (emphasis added)

Over the contention of INA that the two exclusionary policies should be construed together and as equally to give only excess coverage, the court said:

"We think appellee's argument for an affirmance of the judgment . . disregards and ignores the language of defendant's excepting clause 7. None in the long list of authorities cited by appellee supports its argument . . *A common-sense construction of it compels* the conclusion that defendant's policy does not cover as to the . . . [35 bales] of cotton except as excess insurance." 93 F.2d 590, 592.[5]

We agree with this reasoning and conclude that as to the equipment which became covered upon the issuance of the Travelers floating policy, the Trinity policy became excess coverage only.

## THE ISSUE OF NEGLIGENCE

Although, because of the "other insurance" clause of the Trinity policy, we

---

4. This court held that the Hartford Insurance was not "other insurance" in any event, because this cotton had been insured by a pledgee and it was not other insurance which "the owner has". The court therefore, did not need to determine whether the "other insurance" clause contained in the Hartford policy was inconsistent with that contained in the policy issued by St. Paul.

5. As previously indicated there was an additional batch of 119 bales as to which there were two outstanding insurance policies. As to these bales, which had been

insured by a pledgee, the court found that the St. Paul policy was primary insurance, both because of its construction of the Hartford policy that had been issued as to these bales, but also, because it was not any insurance taken out by the "owner." We have not been favored by an opportunity to read the language in the Hartford policy, because the court did not find it necessary to reach this point in view of its holding that there was no conflict between the St. Paul policy issued by the owner of the cotton and the Hartford policy issued by pledgee, not acting for the owner.

have agreed with the result reached by the trial court that there can be no recovery against it, no matter whether the conditions and exclusions are still viable, this does not end the case. As we have indicated above the trial court instructed the jury that if they answered interrogatory number one in the affirmative they were not to answer any of the interrogatories dealing with the possible negligence by the defendants other than the insurance company. For some reason, the court, even in submitting the issue to the jury under interrogatory number one, used language which does not track the conditions or exclusions contained in the policy itself. This question, as indicated above, spoke in terms of "some undetected, structural defect that would render it incapable of lifting the gate, in accordance with the plans submitted by Carlton to the Corps of Engineers . . . which, absent such a structural defect, it would have lifted, and, if so, did such a defect *play any part, no matter how small,* in actually bringing about or causing the collapse of the boom."

Just why the trial court submitted this issue or constructed what it conceived to be a "complete" verdict in this form is not readily discerned, and was not either explained or mentioned in its post-verdict memorandum opinion. Obviously the concept is one of warranty of fitness, perhaps as bearing on the Miller Act liability for rentals. Why the court conditioned traditional negligence issues on a negative answer to this issue is even less clear.

■ Agreeing with Trinity's co-appellees that in submission of special interrogatories, F.R.Civ.P. 49(a), there is wide latitude in form and content, Grey v. First National Bank of Dallas (5 Cir. 1968) 393 F.2d 371, this does not answer the problem here. For here Travelers excepted very plainly to the conditional submission. This went right to the heart of the negligence theory so it was in no

sense a matter of the form or content of the interrogatories. It was a matter of when—if ever—the jury could consider the conditioned inquiries. These objections precisely met the requirements of Rule 49(a) to prevent absence of an issue or answer being the basis for a presumed finding by the court. Appellees' feeble effort to claim harmless error on the theory that the general charge stated standards of negligence, proximate cause, etc. do not suffice. The verdict was, as it should be under F.R. Civ.P. 49(a), structured for answers to the interrogatories and as conditioned the jury never got to the negligence issues.

The only justification of the conditional submission of the negligence issue would have to be on the assumption that, as a matter of Texas law, breach of a warranty of fitness as between lessor and lessee may be held to exonerate the lessee from liability for tortious damages occasioned *in part* by the intrinsic defect, but so far there is no demonstration by Texas precedent, trend, philosophy or declared policy that this is now the Texas law.

■ Whatever might have been the propriety of the submission—and the res judicata binding effect of the issue and jury answer so far as it might later be determined to be significant under Texas law—it is plain that, as the pretrial stipulation contemplated, lessee's negligence was an issue and specific inquiry could not be conditioned on a finding of no breach of warranty of fitness.

■ The trial court itself in its charge to the jury stated:

"By the term 'proximate cause' is meant a cause which in a natural and continuous sequence, produces an event (in this case, the collapse of the boom) and without which the event would not have occurred; and to be a proximate cause of an event, it should have been reasonably anticipated and

foreseen by a person exercising ordinary care that the event or some similar event might occur as a natural and probable consequence. *There may be more than one proximate cause of an event."* (emphasis added)

The trial court also correctly charged on the negligence issue. It stated:

"By the term 'negligence' is meant a failure to do that which a person of ordinary prudence, in the exercise of ordinary care, would do under the same or similar circumstances, or the doing of that which a person of ordinary prudence in the exercise of ordinary care would not do under the same or similar circumstances."

As we understand the Texas law these charges are both adequate and proper, see Rudes v. Gottschalk, (159 Tex. 552, 324 S.W.2d 201, 1959).

We conclude that the jury's answer, from which the court then concluded that Trinity was not liable on its policy, did not answer the negligence question which the parties had stipulated were in the case and which the trial court fully charged right up to the moment when he made any answer with respect to it conditioned upon a negative answer by them to interrogatory number one.

As indicated, we agree with the trial court that recovery could not be had against Trinity on its policy because of its carefully worded "other insurance" clause. We are forced to conclude, however, that the judgment of the trial court must be reversed in order that the issue of negligence may be considered by the jury.[6]

The judgment is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

6. In this case the parties stipulated that it was not necessary to prepare and submit to this court a transcription of the evidence. We, of course, therefore, are without the ability to determine whether proof of negligence sufficient to submit the case to the jury was shown. We assume that it was, however, from the fact that the trial court charged on the theory of negligence when he submitted the case for jury consideration.